AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Lowrance GPS<br>Seizure No. 2023250100052101- 0007<br>("Target Device 3") | )<br>)<br>)<br>)<br>)<br>)    Case No.   **23mj3407-SBC** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-3, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

     ☑ evidence of a crime;

     ☑ contraband, fruits of crime, or other items illegally possessed;

     ☑ property designed for use, intended for use, or used in committing a crime;

     ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC Sec. 1324(a)(2)(B)(ii) | Attempted Bringing in Aliens for Financial Gain |
| 8 USC Sec. 1324(a)(1)(A)(i) | Attempted Bringing in Certain Aliens Other Than At A Designated Port of Entry and Aiding and Abetting |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

     ☑ Continued on the attached sheet.

     ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dean T. Duprey HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date: ___September 18, 2023___

_____
*Judge's signature*

City and state: __San Diego, California__

Hon. Steve B. Chu, United States Magistrate Judge
_____
*Printed name and title*

**AFFIDAVIT**

I, Dean T. Duprey, Special Agent with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

**INTRODUCTION**

1.      I make this affidavit in support an application for a search warrant in furtherance of an alien smuggling investigation conducted by HSI for the following target property seized during the arrest of Christobal VEGA and Guadalupe LUGO on August 19, 2023:

> 1) Gray Google Cell Phone
> Seizure No. 2023250100052101- 0002
> ("Target Device 1")
> 2) Teal Zuum Cell Phone
> Seizure No. 2023250100052101- 0002
> ("Target Device 2")
> 3) Black Lowrance GPS
> Seizure No. 2023250100052101- 0007
> ("Target Device 3")
>
> (Collectively, the "Target Devices")

as further described in Attachments A-1, A-2, and A-3, and to seize evidence of crimes, as further described in Attachment B and incorporated herein, specifically 8 U.S.C. § 1324(a)(2)(B)(ii) – Attempted Bringing In Alien for Financial Gain; 8 U.S.C. §§ 1324(a)(1)(A)(i) and (v)(II) – Attempted Bringing In Certain Aliens Other Than at a Designated Port of Entry; and 18 U.S.C. § 2 – Aiding and Abetting.

2.      The Target Devices were seized from a Wellcraft-style vessel operated by Christobal Vega and Guadalupe Lugo after it was stopped by the United States Coast Guard on August 19, 2023. VEGA and LUGO were arrested on suspicion of alien smuggling after eight illegal aliens were found on board the vessel, including four unaccompanied minors, without documentation demonstrating legal right to enter or reside in the United States. Specifically, Target Device 1 was located on VEGA's person, Target Device 2 was located VEGA's person, and Target Device 3 was located on the vessel as an installed dash-mounted GPS device.  VEGA claimed ownership of Target Device 1, denied ownership of

Target Device 2, and no claim of ownership in Target Device 3 was made. The Target Devices are presently in Homeland Security Investigations custody in San Diego, California.

3.      Given the extensive coordination and planning required for maritime smuggling ventures, it is believed that Target Device 1 and Target Device 2 were used to communicate with co-conspirators leading up to the arrest of VEGA and LUGO, and that evidence regarding the smuggling event, including GPS location data, is contained on Target Device 3. Probable cause exists to believe that the Target Devices contain evidence relating to violations of 8 U.S.C. § 1324(a)(2)(B)(ii); 8 U.S.C. §§ 1324(a)(1)(A)(i) and (v)(II); and 18 U.S.C. § 2.

4.      The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of establishing probable cause in support of the application for a search warrant for the Target Devices, it does not set forth every fact that I or others have learned during the course of this investigation. All dates and times described are approximate.

## EXPERIENCE AND TRAINING

5.      I am a Special Agent (S/A) with the Homeland Security Investigations and have been employed as such since December of 2019. I am currently assigned to the HSI Office of the Special Agent in Charge in San Diego, California. As such, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedures, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

6.      During my tenure with HSI, I have participated in numerous investigations involving maritime alien and narcotics smuggling, as well as investigation of various alien smuggling organizations. I have investigated cases involving the importation and

distribution of controlled substances and the smuggling of aliens into and through the Southern District of California.  Through my training and experience and conversations with other law enforcement officers experienced in maritime alien smuggling investigations, I have gained a working knowledge of the operational habits of alien smugglers, in particular those who attempt to smuggle aliens into the United States from Mexico through maritime or ocean bound routes.

7.     I am aware that it is common practice for alien smugglers to work in concert utilizing cellular telephones.  With respect to the smuggling of aliens in this manner, I am aware that alien smugglers in Mexico frequently communicate with the individual responsible for piloting the vessel into the United States.  These communications can occur before, during, and after the aliens are smuggled into the United States.  For example, prior to the vessel's departure, alien smugglers frequently communicate with the transporter(s) regarding arrangements and preparation for the event.  When the smuggling is underway, alien smugglers frequently communicate with the transporter(s) to remotely monitor the progress of the smuggling, provide instructions, and warn accomplices about law enforcement activity.  When the aliens have been smuggled into the United States, alien smugglers may communicate with the transporter(s) to provide further instructions regarding the pickup or delivery of the aliens to a destination within the United States.

8.     Maritime smugglers use GPS devices to navigate vessels carrying smuggled aliens or narcotics from Mexico through open waters into Southern California. GPS devices may function by tracking and recording the location of the device, and therefore, the location of any object containing the device such as a vessel or vehicle. The GPS device also provides a digital display of the device's position relative to geographic features. GPS devices may record the coordinates or route of the vessel's transit, providing critical insight into the smuggler's journey.

9.     Based upon my training, experience, and consultations with law enforcement officers experienced in maritime alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM

card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. Similarly, GPS devices can contain evidence regarding the device's location history. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones and GPS devices of individuals involved in the smuggling of aliens may yield evidence:

    a.    tending to indicate efforts to smuggle aliens from Mexico into the United States and efforts to transport aliens within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of aliens from Mexico into the United States and the transportation of aliens within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling, transportation, or housing of illegal aliens or a federally controlled substance, from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling, transportation, and housing of illegal aliens or controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10.    On August 19, 2023, at approximately 12:04 p.m., while on routine patrol, United States Coast Guard Cutter (USCGC) PETREL identified as a target of interest (TOI), an approximately 26-foot Wellcraft-style vessel with twin 140 horsepower outboard

1   engines (later identified as CA 6835VG) in approximate location 32°44.087 N, 117°18.06
2   W. At approximately 12:07 p.m., USCGC PETREL launched the cutter small boat (CG-
3   171186) with an embarked boarding team to conduct a boarding of the TOI. At
4   approximately 12:17 p.m., CG171186 came alongside the vessel in position 32°45.57 N
5   117°14.77 W and officers observed three (3) individuals on deck. The boarding team
6   queried the master of the vessel for the number of people onboard. The master of the vessel
7   hesitantly stated that there were ten (10) people on board. Officers next asked the master
8   of the vessel if all were United States citizens, to which he replied, "they are as far as he
9   knows."

10      11.    The master of the vessel was later identified as Christobal VEGA, the only
11   United States citizen on board. Coast Guard officers asked the person operating the vessel
12   if he was a U.S. citizen, but he did not speak English. This person was later identified as
13   Guadalupe LUGO. Coast Guard officers then told the master of the vessel (VEGA) to open
14   the hatch to the cabin, which he replied was locked. VEGA pulled out a key and opened
15   the hatch. Inside the cabin, officers observed several individuals, to include five (5) minors
16   and two (2) adult males, all locked inside the cabin. The Coast Guard officers asked the
17   persons in the cabin their nationality and each claimed Mexico.

18      12.    VEGA stated that he left from Mission Bay, California, and was returning to
19   Mission Bay. VEGA stated that when he left Mission Bay, it was just him and the other
20   individual driving (LUGO) the vessel. VEGA claimed that he had picked the rest of the
21   people up off a raft near the Coronado Islands. At approximately 12:39 p.m., the crew from
22   CG-171186 took the vessel to the Lifeguard Station in Mission Bay and moored it while
23   waiting for United States Border Patrol (USBP) to arrive. At approximately 2:43 p.m.,
24   USBP agents arrived on scene and took custody of all ten persons on board and transferred
25   them to the San Clemente Border Patrol Station.

26      13.    At approximately 2:45 p.m., United States Border Patrol Agents assigned to
27   the San Clemente Station arrived at Mission Bay in San Diego California, and a Border
28   Patrol Agent identified himself as to the ten individuals and questioned each individually

as to their citizenship. One subject claimed to be a United States Citizen. The other nine (9) subjects claimed to be citizens and nationals of Mexico. The Border Patrol Agent asked if the nine subjects were in possession of any legal documentation that would allow them to enter or remain in the United States legally. All subjects stated to the Border Patrol Agent that they had no legal documentation that would allow them to enter or remain in the United States. At approximately 2:50 p.m., the Border Patrol Agent placed all ten subjects under arrest and transported one (1) Mexican National (LUGO) and one (1) United States citizen (VEGA) to the San Clemente Border Patrol Station for further processing. A Border Patrol Agent from the Imperial Beach Border Patrol Station assisted in transporting the remaining subjects to the San Clemente Border Patrol Station.

14.    The following individuals were identified as principle (P) defendants to the case: Christobal VEGA (P1) and Guadalupe LUGO (P2). The following individuals were identified as material witnesses (MW) to the case: Jose Manuel CASTELLON-Gonzalez (MW 1), Gustavo Alonso CHAVEZ-Paredes (MW 2), Rosendo ALVAREZ-Carvajal (MW 3), and L.M.H-P (Minor) (MW 4).

15.    On August 20, 2023, at approximately 12:41 a.m., Homeland Security Investigations (HSI) Special Agents conducted an interview of Jose Manuel CASTELLON-Gonzalez (MW 1). During the interview, CASTELLON conveyed that he was a citizen of Mexico and did not have any documents allowing him to legally enter the United States. CASTELLON stated he was provided a phone number to a smuggler while he was in Jalisco, Mexico. CASTELLON called the smuggler and arranged to be smuggled into the United States for the sum of $17,000 USD. CASTELLON stated that he was instructed to fly to Tijuana, Mexico and to bring beach attire to wear. CASTELLON arrived at the Tijuana airport and was picked up and taken to a residence. At this residence, CASTELLON met with the other members of the group waiting to be smuggled. The next day the group was picked up in a van and driven to the location of a panga boat. At sunrise the panga departed for the ocean and eventually met with another vessel at sea.

1  CASTELLON stated when the boat [26-ft Wellcraft] arrived, he did not see anyone from
2  the panga waving at the boat.

3      16.    CASTELLON was shown a six-pack photo lineup and identified Person #3
4  (VEGA), and Person #5 (LUGO) as being on board the boat as it arrived at the panga.
5  CASTELLON stated they were told to get on the boat and to get into the cabin.
6  CASTELLON was not sure if it was VEGA or LUGO who told them to get into the cabin
7  and sit down. CASTELLON stated that the panga driver stayed behind and did not board
8  the boat. CASTELLON further stated that he was scared for his life and did not know how
9  to swim. CASTELLON also stated that while they were on the panga that the children were
10  screaming and vomiting.

11      17.    Gustavo Alonso CHAVEZ-Paredes (MW 2), Rosendo ALVAREZ-Carvajal
12  (MW 3), and L.M.H-P (Minor) were likewise interviewed by Homeland Security
13  Investigations Special Agents, providing similar accounts as to smuggling arrangements
14  and financial payment.

15      18.    During a search of Christobal VEGA's person, two cellular phones were
16  discovered, including a gray Google cellphone (Targe Device 1) and a teal Zuum cellphone
17  (Target Device 2). VEGA claimed ownership of the gray Google cellphone but denied
18  ownership of the teal Zuum cellphone (Target Device 2). Additionally, during a search of
19  the vessel, a dash-mounted GPS device, described as a black Lowrance GPS (Target
20  Device 3) was found. This device was not affirmatively claimed but was physically
21  attached to the vessel.

22      19.    Christobal VEGA ("VEGA") and Guadalupe LUGO ("LUGO") were placed
23  under arrest for violations of Title 8 U.S.C. § 1324(a)(2)(B)(ii), Title 8, U.S.C., §
24  1324(a)(1)(A)(i) and (v) (II), and Title 18 U.S.C. § 2.

25      20.    During a post Miranda interview, Christobal VEGA (P1) claimed that his
26  mother purchased the boat on Craigslist or eBay for approximately $25,000 USD, and that
27  it was purchased locally in San Diego, California. VEGA claimed that he drove to Chula
28  Vista, California, to LUGO's house and the boat was already on a trailer attached to a

newer black Ford truck. VEGA traveled with LUGO to Dana Landing where they pulled into a slip and picked up bait. VEGA stated that when they arrived at the fishing spot in the "islands" (referring to the Coronado Islands located off the Northwest coast of Baja California), they ran into a small panga boat. VEGA stated they were flagged down by a Mexican male who asked for help as his boat broke down. VEGA stated that LUGO said they will take them to shore, and the passengers of the panga got onto VEGA's boat, and all went into the forward cabin compartment except for the Mexican male. VEGA stated that he was unaware as to how the forward cabin compartment got locked.

21.     During a post Miranda interview, Guadalupe LUGO (P2) stated that he met VEGA at a party at some point in July 2023, and that VEGA was teaching LUGO how to drive the boat. LUGO stated that on August 19, 2023, VEGA picked him up at his sister's house, stating it was the first time the two had gone fishing. LUGO stated VEGA was the one that put the boat in the water and prepared everything. LUGO stated that VEGA had a friend that helped launch the boat. LUGO stated that he and VEGA went out of the bay and drove approximately thirty minutes before they encountered the panga at sea. LUGO stated that the panga waved them down and asked for help. LUGO indicated that ALVAREZ stayed outside on the deck of the boat while everybody else from the panga went inside. LUGO stated that a black TCL phone belongs to him, and the blue Zoom cellphone was not his. LUGO claimed VEGA told the individuals to go into the forward cabin compartment in the boat. LUGO denied being paid and said they were just helping.

22.     Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the Target Devices.  In light of the facts above and my experience and training, there is probable cause to believe that one or more of the vessel's occupants may have used the Target Devices to communicate with others to coordinate the smuggling of aliens into the United States.

23.    I know through my training and experience that alien smugglers may be involved in the planning and coordination of an alien smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest (if a defendant is under arrest) and will continue to attempt to communicate with a defendant after their arrest (if under arrest) to determine the whereabouts of the alien and/or vessel. Based on my training and experience, it is also not unusual for individuals to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Devices for data beginning on July 18, 2023 to August 19, 2023.

## METHODOLOGY

24.    It is not possible to determine, merely by knowing the cellular phone or GPS/chartplotter device's make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. GPS devices may include location history and can also include SIM cards that allow other cellular devices to "ping" the GPS devices location. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the

data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25.     Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the telephone or GPS device and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

26.     Based on the foregoing, identifying and extracting data subject to the seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## CONCLUSION

27.     Based on the information described above, I believe that probable cause exists to conclude that the Target Devices were used to facilitate the Target Offenses. The Target Devices were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of the Target Offenses. I also believe that probable cause exists to believe that evidence, fruits, and instrumentalities of illegal activity committed by VEGA, LUGO, and others continues to exist on the Target Devices.

28.     Based upon my training and experience, consultation with other agents in alien smuggling investigations, consultation with sources of information, and the facts set forth herein, I know that the items to be seized as set forth above are likely to be found in the property to be searched, described above in Paragraph 1. Therefore, I respectfully request that the Court issue a warrant authorizing me, a Special Agent with HSI, or another law enforcement employee specially trained in digital evidence recovery, to search the

1  items described in Attachments A-1, A-2, and A-3, and seize the items listed in Attachment

2  B using the above-described methodology.

3

4  I swear the foregoing is true and correct to the best of my knowledge and belief.

5

6  Dean T. Duprey
   Homeland Security Investigations

7

8  Sworn and attested to under oath by telephone, in accordance with Federal Rule of

9  Criminal Procedure 4.1, this 18th day of September 2023.

10

11  Honorable Steve B. Chu

12  United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A-3**

## PROPERTY TO BE SEARCHED

The following property is to be searched in connection with an investigation of violations of Title 8, United States Code, Section 1324(a)(2)(B)(ii) – Attempted Bringing In Alien for Financial Gain; Title 8, United States Code, Section 1324(a)(1)(A)(i) and (v)(II) – Attempted Bringing In Certain Aliens Other Than at a Designated Port of Entry; and Title 18, United States Code, Section 2 – Aiding and Abetting:

Black Lowrance GPS
Seizure No. 2023250100052101- 0007
("Target Device 3")

Target Device 3 is currently in the possession of Homeland Security Investigations located at 880 Front Street, Suite 3200, San Diego, California 92101.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the electronic devices described in Attachments A-1, A-2, and A-3 include the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic devices. The seizure and search of the electronic devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the electronic devices will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 18, 2023, up to and including August 19, 2023:

a. tending to indicate efforts to commit violations of 8 U.S.C. § 1324(a)(2)(B)(ii) – Attempted Bringing In Alien for Financial Gain; 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(II) – Attempted Bringing In Certain Aliens Other Than at a Designated Port of Entry; 18 U.S.C. § 2 – Aiding and Abetting (collectively, the "Target Offenses");

b. tending to identify accounts, facilities, storage devices, or services – such as email addresses, IP addresses, and phone numbers – that may contain electronic evidence regarding efforts to commit the Target Offenses;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to commit the Target Offenses;

d. tending to identify travel to or presence at locations involved in efforts to commit the Target Offenses;

e. tending to identify the user of, or persons with control over or access to, the subject device; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of 8 U.S.C. § 13241324(a)(2)(B)(ii); 8 U.S.C. 1324(a)(1)(A)(i) and (v)(II); and 18 U.S.C. § 2.**